# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-KA-00474 COA

**JESSIE JAMES REYNOLDS**                                                   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                       **APPELLEE**

DATE OF JUDGMENT:              01/30/1997
TRIAL JUDGE:                          HON. ROBERT H. WALKER
COURT FROM WHICH APPEALED: HARRISON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:   F. HOLT MONTGOMERY JR.
                                           SCOTT WATSON WEATHERLY JR.
ATTORNEYS FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                                           BY:  BILLY L. GORE
DISTRICT ATTORNEY:              CONO CARANNA
NATURE OF THE CASE:            CRIMINAL - FELONY
TRIAL COURT DISPOSITION:     01/30/1997: TRANSFER OF A CONTROLLED
                                           SUBSTANCE (HABITUAL OFFENDER): SENTENCED TO
                                           SERVE A TERM OF 10 YRS IN THE CUSTODY OF THE
                                           MDOC TO SERVE DAY FOR DAY WITHOUT HOPE OF
                                           PAROLE OR PROBATION;
DISPOSITION:                         AFFIRMED - 4/6/99
MOTION FOR REHEARING FILED:
CERTIORARI FILED:
MANDATE ISSUED:                  4/27/99


EN BANC:

COLEMAN, J., FOR THE COURT:


¶1. Pursuant to an indictment which charged that Jessie James Reynolds sold or transferred cocaine, a schedule II controlled substance, to Robert Hooker as an habitual offender defined by Section 99-19-81 of the Mississippi Code (Rev. 1994), Reynolds was tried and found guilty by a jury in the First Judicial District

of Harrison County. Although Section 99-19-81 requires that an habitual offender like Reynolds be sentenced to serve the maximum penalty, which is thirty years imprisonment for the sale or transfer of a schedule II controlled substance, the trial judge relied on the authority of *Clowers v. State* to sentence Reynolds "to serve TEN (10) YEARS in the custody of the Mississippi Department of Corrections to serve day for day without hope of parole or probation as provided in Section 99-19-81 . . . ." In this appeal from the trial court's final judgment and order sentencing him, Reynolds presents but one issue for this Court's analysis and resolution. We quote Reynolds's one issue verbatim from his statement of issues required by Rule 28(a)(3) of the Mississippi Rules of Appellate Procedure:

## I. WAS THE APPELLANT INEFFECTIVELY REPRESENTED BY COUNSEL AT THE TRIAL BELOW, MANDATING A REVERSAL OF HIS CONVICTION?

From our review of the evidence and events which transpired during the course of Reynolds's trial and afterwards, we affirm the trial court's final judgment of Reynolds's conviction of the sale of cocaine and its sentence imposed on Reynolds.

### FACTS

¶2. The Coastal Narcotics Enforcement Team (CNET) is a combination of personnel from both the Gulfport Police Department and the Mississippi Bureau of Narcotics (MBN). It's function is to enforce Mississippi's controlled substances laws. At approximately 7:55 p.m. on September 13, 1995, Robert Hooker, an undercover agent for MBN assigned to CNET, purchased approximately two grams of crack cocaine for twenty dollars from an African-American male whom Hooker identified as the appellant, Jessie James Reynolds.[1] Hooker was sitting beneath the steering wheel in a brown station wagon parked in the parking lot at Cohea's lounge located on Old Pass Road just west of Broad Avenue in Gulfport when Reynolds approached Hooker and exchanged one rock of crack cocaine for a twenty-dollar bill which Hooker handed to him. The remainder of the facts are related in the manner which is consistent with the State's evidence on which the jury convicted Reynolds.

¶3. Before Hooker had driven the brown station wagon onto the parking lot at Cohea's lounge, Gary Ponthieux, a narcotics investigator for the City of Gulfport Police Department who was also assigned to CNET, and undercover agent Hooker had planned an evening of conducting what these officers described as "buy bust" operations. A "buy bust" operation is one in which the alleged purveyor of the controlled substance is arrested as quickly as possible after he has sold the controlled substance to the undercover agent. A surveillance, or "take down" team, composed of other law enforcement officers, arrests the seller of the illicit substance when they hear the undercover agent's command over the undercover agent's body mike to move into the area and make the arrest. Officer Ponthieux commanded the surveillance team that ultimately arrested Reynolds.

¶4. There were several African-American males and perhaps a few African-American females standing in the Cohea's Lounge parking lot when Hooker parked the station wagon and asked a man "to come up to [his] car, if he had a twenty." "Twenty" is the drug culture's appellation for one rock of crack cocaine. The man approached Hooker, who remained seated beneath the steering wheel, advised Hooker that he had a twenty, and then "walked to the back of [Hooker's] vehicle and met with another unknown male." The first male, whom Hooker subsequently identified as Reynolds, returned to the driver's window and consummated the transaction. After the sale was made, Hooker drove "probably about ten yards east of [the] buy transaction[] and . . . gave the command for [the] surveillance team to come in and make the

arrest." When Hooker gave the command for the surveillance team to arrest Reynolds, Hooker "gave a description that [the seller] was wearing white socks, gray short pants, and a blue shirt."

¶5. Investigator Ponthieux commanded the surveillance team which moved in to arrest Reynolds based upon Hooker's description of the seller's clothing. As Ponthieux moved in with the surveillance team, he "observed this individual wearing the same clothing description that Agent Hooker had [given him] over the body transmitter" and "detained that individual." Ponthieux heard Hooker describe the seller as "a male wearing a dark blue T-shirt, short pants."

¶6. Reynolds was standing in front of a car with his hands on its hood when Ponthieux arrested him. Ponthieux's search of Reynolds found nothing, but Ponthieux "located a twenty-dollar bill on the ground which was located underneath where Mr. Reynolds was standing in front of the vehicle." Reynolds "had his feet spread at the time, and the [twenty-dollar bill] was in between his feet a little bit behind him." Ponthieux was unable to identify further the twenty-dollar bill that he found between Reynolds's feet because, as Ponthieux later testified, "There was an error on my part in failing to make a notation of the serial numbers on the twenty-dollar bill that was issued to Agent Hooker."

¶7. Agent Hooker had stopped his vehicle immediately after he ordered the surveillance team to arrest the man he described as "wearing white socks, gray short pants, and a blue shirt," and returned on foot to the scene of the illicit transaction in time to find that the surveillance team had indeed detained the man who had sold him the rock of crack cocaine for twenty dollars. Agent Hooker then tried to identify the second man whom Hooker had observed handing the rock to Reynolds when Reynolds stepped to the rear of Hooker's vehicle. Although Hooker instructed members of the surveillance team to detain Chris Harper because Hooker thought that Harper might have been the second suspect, Hooker was unable to identify Harper as the supplier of the rock which Reynolds had sold to him. However, during their detention of Harper, members of the surveillance team ordered Harper to pull down his pants, after which they searched Harper. Harper had no controlled substances in his clothing or otherwise on his person; hence the officers released Harper.

¶8. After the officers had arrested Reynolds, they took him to the Harrison County detention facility where his clothing was relinquished and inventoried by Harrison County deputies. Reynolds's picture, or mug shot, was also taken at the detention center. Reynolds signed a personal property form which contained descriptions of his watch, ring, one pair of gray pants, one blue hat, one black shirt, one brown shoe, and one blue belt. Reynolds did not sign that part of the form intended for his certification "that the personal property listed above is all of the property [he] had in [his] possession at the time of admission." No date appears on the personal property form. On May 2, 1996, Reynolds was transferred with the status of trustee from the Harrison County detention center to the Harrison County work center, where he remained until October 23, 1996, when he was returned to the detention center to await trial on the charge for which he was convicted in this case.

## II. Trial

¶9. Reynolds's first trial on his indictment for the sale of cocaine to Agent Hooker ended in a mistrial after the jury had been unable to reach a verdict. Among Reynolds's witnesses at his first trial was a man named George Peters or, perhaps, George Peterson. Reynolds did not testify at his first trial. For Reynolds's second trial on this same charge, the State called as its three witnesses MBN Agent Robert Hooker, Narcotics Investigator Gary Ponthieux, and Alison Smith, a drug analyst employed by the Mississippi Crime

Laboratory. The testimony of Officers Hooker and Ponthieux is reflected in the foregoing recitation of the facts from which the grand jury indicted Reynolds. Smith testified to establish that the substance which Hooker purchased for twenty dollars was cocaine, a controlled substance.

¶10. At his second trial, Reynolds also called three witnesses. They were: (1) Chris Harper, whom Agent Hooker thought might have been the person who gave Reynolds the rock of crack cocaine which Reynolds sold Hooker, (2) Walter Pitts, a sergeant with the Harrison County Sheriff's Office, who was the records custodian for the sheriff's office, and (3) Reynolds himself. Although it appears that Reynolds's counsel had successfully served George Peters with a witness subpoena to testify at this second trial, Peters ignored the subpoena and did not appear. Reynolds's trial counsel elected to forego further action against Peters to compel his presence as a witness for Reynolds because he deemed Peters's testimony to be cumulative to the testimony of Chris Harper and Reynolds.

¶11. Reynolds's appellate counsel's argument on his one issue in this appeal requires that this Court relate the following events and specific testimony that occurred during Reynolds's second trial. In his opening statement which he made before the State began its presentation of the evidence, Reynolds's trial counsel stated, "Ladies and gentlemen, the only issue in this case is an issue of identification." Reynolds's counsel explained that his client did not contest the fact that Agent Hooker had bought a rock of crack cocaine from some man in the Cohea's Lounge parking lot; instead, Reynolds "vehemently contest[ed] the fact that Jessie Reynolds is the individual that made this sale."

¶12. Reynolds called Chris Harper to establish that on the afternoon of September 13, 1995, he had taken his Monte Carlo automobile to Jessie Reynolds's house so that Reynolds could rebuild its engine. Harper had known Reynolds "a good five or ten years at the most," and Reynolds had repaired Harper's Monte Carlo before. Later that afternoon, after he had finished shooting basketball at the Gaston Hewes Recreation Center and had started walking home, Harper met Reynolds "on 15th Street on the sidewalk between [the] Beach and Cohea's Lounge." George Peters was with Reynolds. According to Harper, while Reynolds, Peters, and he were walking in front of Cohea's Lounge, "A black male . . . drove up in his station wagon . . . . Then about five or six people ran to the station wagon. Then somebody sold him crack cocaine. By that time about five seconds later, everybody was on the ground."

¶13. Harper then testified that the officers who put him on the ground asked, "Where's it at?" Harper continued: "[W]hen the young man . . . got out . . . of the station wagon, he came and pointed at me . . . ." Then the officers made Harper pull down his pants and take off his shoes. When the officers found nothing on Harper, Hooker "point[ed] at Jessie James Reynolds." According to Harper, the officers arrested Reynolds for the same thing they had accused him of doing earlier. Harper was released on the spot.

¶14. Reynolds called his second witness, Walter Pitts, to establish what items of clothing Reynolds was wearing on the night of September 13, 1995, when Reynolds was "booked" into the Harrison County detention center. Pitts described the booking process, which included the arrested person's completion of a personal property form on which were described all of the items of property, including his clothing, in the arrested person's possession. Mr. Pitts identified the unsigned and undated personal property form which listed and described Reynolds's watch, ring, and five items of clothing.[2] Reynolds introduced into evidence the personal property form on which Reynolds's five items of clothing were described as one pair of gray pants, one blue hat, one black shirt, one brown shoe, and one blue belt.

¶15. During his direct examination of Sergeant Pitts, Reynolds's trial counsel asked about the contents of a

bag that the sergeant had brought to the witness stand. Pitts identified the bag's contents as "a pair of pants, a T-shirt, and a blue baseball cap." Pursuant to Reynolds's counsel's motion, the pair of pants was marked for identification as "Exhibit No. D-2;" the baseball cap was marked for identification as "Exhibit No. D-3;" and the shirt was marked for identification as "Exhibit No. D-4." The bag which contained the clothing was also marked for identification as "Exhibit No. D-5." Sergeant Pitts testified that he had first seen the bag and its contents that morning "[i]n [the] property room of the jail." He further identified the pants, shirt, and baseball cap as being Reynolds's property. Reynolds's counsel never moved to introduce into evidence the bag, pants, shirt, and baseball cap which had been marked for identification only.

¶16. The assistant district attorney cross-examined Sergeant Pitts in an effort to demonstrate that there was a possibility that the bag contained Reynolds's clothing which he was wearing when he returned from the work farm to the detention center on October 23, 1996, rather than the clothing he wore when he was first arrested early in the evening of September 13, 1995, and initially "booked" into the Harrison County detention center. We quote from the record the following portion of the State's cross-examination of Sergeant Pitts because Reynolds emphasizes it as but one example of his trial counsel's ineffective representation:

Q And when you get trustee status, your belongings are returned to you, are they not

A Exactly.

Q And then if for some reason your belongings are given back to you, they're yours to do with what you please. Is that correct?

A Correct.

Q And if then later on you leave the work center and come back to the detention facility, any belongings that you have at that time have to be put back into custody, correct?

A Correct.

Q Now, if you're arrested and placed in the detention facility, your belongings are bagged?

A Correct.

Q If you're released to the work center, then your belongings are given back to you?

A Correct.

Q And if sometime subsequent to that you go back to the detention facility, you put your property back into custody, correct?

A Correct.

Q There is no way of knowing if the same property that left the facility and was given to Mr. Reynolds when he went to the work center is the same property we're looking at today, is there?

A Correct.

Q How long was Mr. Reynolds at the work center?

A He went to the work center on 5/2 of '96.

Q When did he return?

A He returned back from the work center to the jail on 10/23 of '96.

Q So for roughly five months, Mr. Reynolds had possession of whatever property was -- he was booked in with?

A Correct.

¶17. Reynolds testified that he and George Peters had begun the disassembly of the engine of Chris Harper's Monte Carlo "somewhere around 3:30, 4:00" that afternoon. They finished "tearing it down" "right at dark," and then they "went up the street to find Chris Harper." Reynolds and Peters encountered Harper near Cohea's Lounge, where Reynolds saw "fifteen or twenty" people, both male and female, gathered in front of that establishment. Reynolds testified that he saw the brown station wagon pull into the parking lot and park. According to Reynolds, "A few guys ran up to the station wagon, and [Agent Hooker] shortly . . . pulled off." After the station wagon began to leave, "the undercover agents, they [sic] just come [sic] out of nowhere."

¶18. Reynolds corroborated Chris Harper's testimony that the members of the surveillance team "rushed my friend Chris Harper" and made Harper pulled his pants down to search him. While the officers were searching Harper, "the station wagon backed up to the scene of the crime. When [Agent Hooker] jumped out of the car, he -- someone asked him something -- someone made a statement, 'Is this the one?' He [Agent Hooker] said, 'That's him.'" However, Reynolds added that when the station wagon first "pulled back," Agent Hooker approached Chris Harper, and "then pointed at me." When Agent Hooker pointed at Reynolds, "Many of them [the members of the surveillance team] left Chris and came over there and threw me on the car, searched me down." In answer to his counsel's further questioning, Reynolds testified that he "didn't have anything on me," and he denied that he had sold cocaine to Agent Hooker. Reynolds concluded his direct examination by describing what he was wearing that night: "I was wearing a blue Dallas Cowboy cap, a black T-shirt, a pair of gray pants, which had my brother's name in the side of them, and a pair of brown Nike tennis shoes." When his counsel asked, "Were you wearing socks?," Reynolds answered, "No, sir."

¶19. The record reflects that the jury began its deliberation at 9:46 a.m. and returned its verdict of guilty as charged at 1:10 p.m. In the course of their deliberations, the jurors sent three notes to the judge, all three of which the judge incorporated into the record. The first note stated, "Would like to see bag, pants, shirt, cap." The second note asked, "Is the inventory list that we have as evidence the original form when [Mr. Reynolds] was incarcerated (arrested)? or when he came back from the work center." The third note was written as follows: "Det. Hooker & Ponthieux testimony."

¶20. During the discussion of these three notes among the prosecutor, Reynolds's counsel, and the judge, the judge opined:

To those two requests the response that the Court suggests is simply that you have received all of the testimony in this case, all the evidence in this case, please resume your deliberations. Because the bag, pants, shirt, and cap were not introduced into evidence, and, of course, we cannot provide them a

transcript of Hooker and Ponthieux's testimony."

Reynolds's trial counsel told the judge that he did not have any problem with the judge's instructing the jury in this manner, but he then observed, "I would love for them [the jurors] to see the bag, but I know it's not introduced." The judge stapled all three notes to the following written response: "You have received all of the testimony and evidence in this case. Please resume your deliberations. Judge Walker P. S: Keep these notes with the jury instructions."

¶21. Reynolds's trial counsel filed a motion to set aside verdict or, in the alternative, for a new trial, on which the trial court conducted a separate hearing more than one month after the conclusion of Reynolds's trial. The trial court denied Reynolds's motion, and Reynolds's trial counsel perfected his client's appeal of the trial court's final judgment of Reynolds's conviction and subsequent order of sentence. About four days after his trial counsel perfected this appeal, he and his client filed a motion to withdraw, in which they recited Reynolds's correspondence with the Mississippi Bar about Reynolds's dissatisfaction with his trial counsel's representation in the circuit court. Another member of the Gulfport Bar was appointed to represent Reynolds in the appeal of his conviction.

¶22. Reynolds's appellate counsel filed with the Mississippi Supreme Court a motion to modify the trial record to include not only Reynolds's mug shot taken on the evening of September 13, 1995, when Reynolds was arrested, but also the three items of clothing, which were the gray pants, black T-shirt, and baseball cap, which Reynolds's trial counsel had marked for identification but had never introduced into evidence after Sergeant Pitts had identified them when he removed them from the bag which he took to the witness stand. The supreme court remanded the motion to modify the trial record to the trial court so that it might conduct a hearing on the merits of Reynolds's appellate counsel's motion to modify the trial record. Although Reynolds's appellate counsel represented Reynolds at this hearing, neither he nor the State called witnesses. Instead, the record of this hearing on remand reflects only the factual assertions and arguments offered by both the assistant district attorney who represented the State in the trial of this case and Reynolds's appellate counsel.

¶23. The record of this hearing on remand to the trial court does not reflect when Reynolds's trial counsel became aware of the existence of Reynolds's mug shot which was taken when Reynolds was booked into the Harrison County detention center on the night of September 13, 1995. After the trial judge heard the arguments of both the State and Reynolds, he granted the motion "to modify the record to include the color photograph and the three articles of clothing." Thus, those items are in the record for this Court's evaluation and consideration.

### III. ANALYSIS AND RESOLUTION OF THE ISSUE

**A. Reynolds's and the State's arguments**

¶24. Reynolds cites *Osborn v. State*, 695 So. 2d 570 (Miss. 1997), to acknowledge that to prevail in a claim of ineffective assistance of counsel, the accused "must . . . show that it is 'reasonably probable' that the trial's outcome would have been different had it not been for counsel's deficiency." Reynolds then "submits that, if ever a case fit precisely under this rubric, then surely this is the case." Reynolds proceeds to identify four things his trial counsel "at a minimum, should have done." First, he should have elicited "clear testimony . . . establishing that the personal property form was completed on the date of Reynolds's arrest and booking, thus establishing the clothing worn by [Reynolds] on that date." Secondly, Reynolds's trial counsel

should have introduced into evidence the "shirt, pants, and cap . . . thus establishing at least a presumption that these were the clothes worn on the date of Reynolds's arrest." Thirdly, "[t]he 'mug shot' itself should have been introduced into evidence, making it clear beyond cavil that Reynolds was wearing a black shirt on the date of his arrest." Fourthly and finally, defense counsel "should have strenuously objected to [Sergeant Walter Pitts's] speculative testimony concerning procedures at an entirely different facility [the work center], without any foundation being laid that [Sergeant Pitts] had any direct knowledge of such procedures."

¶25. The State counters that these four errors are "'sins' of omission as opposed to 'sins' of commission." The State also asserts that "[a]ny scrutiny of [Reynolds's] trial counsel's omissions must await a new horizon in a post-conviction environment where trial counsel will have an opportunity to explain the reasons for his actions and inactions." Based upon the motion to withdraw which Reynolds and his trial counsel jointly filed after Reynolds's appeal had been perfected, the State further suggests, citing *Shaw v. U.S.*, 403 F. 2d 528, 529 (8th Cir. 1968), that "[a] defendant cannot base a claim of inadequate representation upon his refusal to cooperate with appointed counsel." The State adopts for "the centerpiece of [its] retort" the proposition "that the official record, in its present posture, fails on direct appeal to affirmatively demonstrate ineffectiveness of constitutional dimensions."

## B. The law on the ineffective assistance of counsel

¶26. The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." In *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963), the United States Supreme Court held that the Sixth Amendment was made obligatory on the states by the Fourteenth Amendment, and that an indigent defendant in a criminal prosecution in a state court has the right to have counsel appointed for him. In *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970), the United States Supreme Court recognized that "the right to counsel is the right to the effective assistance of counsel."

¶27. In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court established the standard by which appointed counsel's representation of an indigent defendant was to be determined to have been effective or ineffective assistance. The Supreme Court opined: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. In *Strickland*, the Supreme Court explained that if an indigent defendant is to prevail in reversing a conviction on the ground that his court-appointed counsel rendered ineffective assistance, that defendant must satisfy both components of the claim that the defendant's counsel's assistance was that ineffective. *Id.* The Supreme Court has defined each component as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

¶28. With respect to claims of ineffective assistance of counsel, the Mississippi Supreme Court has stated:

> When faced with a claim of ineffective assistance of counsel at trial or sentencing, this Court follows the test set down in *Strickland, supra*. . . . This Court set out the test and standards in *Cabello v. State*, 524 So. 2d 313 (Miss. 1988):
>
> In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984), the United States Supreme Court established a two-prong test, required to prove the ineffective assistance of counsel: the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense . . . . The burden of proof then rests with the movant . . . .
>
> Under the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." . . . In short, defense counsel is presumed competent.
>
> Under the second prong, even if counsel's conduct is "professionally unreasonable," the judgment stands "if the error had no effect on the judgment." . . . . Consequently, the movant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." . . . There is no constitutional right then to errorless counsel . . . .

*Handley v. State*, 574 So. 2d 671, 683 (Miss. 1990) (quoting *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988)).

## C. Analysis of the asserted instances of trial counsel's ineffective representation

### 1. "Clear" testimony about date personal property form was completed

¶29. Sergeant Walter Pitts, the records custodian for the Harrison County Sheriff's Office, testified that the personal property form was used "[w]hen the individual is booked into the jail." In response to Reynolds's counsel's asking him, "What is the purpose of these forms?," Sergeant Pitts answered, "The personal property [form] is to identify the property the individual had on being booked into the facility." To this Court, these answers seem clear enough. It was the assistant district attorney's cross-examination of Sergeant Pitts, which we previously quoted, that established the possibility that Reynolds had two opportunities to complete a personal property form, the second opportunity being when Reynolds was returned from the work farm to the detention center on October 23, 1996.

¶30. Reynolds's appellate counsel does not suggest that "'clear' testimony about [when the] personal property form was completed" was available. Indeed, such testimony might well have been unavailable from any source. *Strickland* established a two-prong criteria for determining whether counsel's representation was so ineffective that his client's conviction must be reversed and remanded for a new trial. The first prong requires the defendant to "show that counsel's performance was deficient." *See Strickland*, 466 U.S. at 687. The Mississippi Supreme Court has elaborated that "[u]nder the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Handley*, 574 So. 2d at 683 (quoting *Cabello*, 524 So. 2d at 315). Even if the State's cross-examination of Sergeant Pitts established the possibility that the unsigned and undated personal property form admitted

into evidence was completed on October 23, 1996, rather than September 13, 1995, the record is devoid of any indication that such "clear testimony" was otherwise available. Hence, this Court declines to deny Reynolds's trial counsel the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" to which *Hanley* holds that he is entitled. Because we decline to find Reynolds's trial counsel's performance deficient, we need not consider the second prong, which is whether "the deficient performance prejudiced the defense." *See Strickland*, 466 U.S. at 687. Thus, we resolve this first facet of Reynolds's issue against him.

## 2. Failure to introduce into evidence the shirt, pants, and cap

¶31. When the judge, prosecutor, and defense counsel were discussing an appropriate response to the jury's three notes of inquiry directed to the judge, Reynolds's counsel stated, "I would love for them [the jury] to see the bag, but I know it's not introduced." Reynolds's appellate counsel interprets his trial counsel's comment as a confession of error on the record. We agree with this interpretation to the extent that Reynolds's trial counsel's failure to introduce into evidence the bag and its contents may be deemed deficient since he had had all four items marked for identification, an indication that he intended to introduce all four items into evidence. Thus, this Court moves to the second prong of the *Strickland* test, *i. e.*, whether "the deficient performance prejudiced the defense."

¶32. Reynolds's trial counsel introduced the personal property form on which were identified the following items: one pair of gray pants, one black shirt, one brown shoe, one blue hat, and one blue belt. When Reynolds testified, he told the jury that he "was wearing a blue Dallas Cowboy cap, a black T-shirt, a pair of gray pants, which had his brother's name in the side of them, and a pair of brown Nike tennis shoes." He denied that he was wearing socks. During his direct examination of Sergeant Pitts, Reynolds's defense counsel asked, "And if an arrestee was wearing socks, wouldn't it be included on the form?" Sergeant Pitts replied, "Yes, Sir, it should." Reynolds's trial counsel adduced evidence about what Reynolds was wearing when he was arrested after dark on September 13, 1995 other than the items of clothing.

¶33. Moreover, in its brief, the State asserts that "[Agent] Hooker made his identification based upon his observation of Reynolds's face, not his clothing." To support its assertion, the State quotes from the record the following snippet of Agent Hooker's testimony: "Simply by [Reynolds] had just previously been inches from my face, was the way I was able to identify him." When Investigator Ponthieux was asked how he arrested Reynolds, he replied, "Well, based on the description that [Agent Hooker] gave me, [Reynolds] was the only individual in front of Cohea's Lounge that was wearing that clothing description. I immediately saw that, recognized that shirt from what [Agent Hooker] told me over the body wire and said, 'that's going to be the guy.'"

¶34. To succeed on this second facet of his issue, Reynolds must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." . . . There is no constitutional right then to errorless counsel . . . ." *Handley*, 574 So. 2d at 683 (quoting *Cabello*, 524 So. 2d at 315). Given the other evidence about Reynolds's clothing on the night he was arrested and Agent Hooker's testimony that he identified Reynolds by his face, which had only been "inches away" when Agent Hooker looked at his face framed in the front passenger's window, the failure to introduce into evidence the pair of pants, shirt, and baseball cap does not create "a reasonable probability that, but for counsel's [failure to introduce these items of clothing into evidence], the result of the

proceedings [Reynolds's conviction] would have been different." In other words, failure to introduce these three items of clothing does not undermine this Court's confidence in the outcome of Reynolds's trial. Again, we resolve this second facet of Reynolds's issue against him.

### 3. Failure to introduce Reynolds's mug shot

¶35. Because the trial court granted Reynolds's appellate counsel's motion to modify the record by including Reynolds's mug shot as an exhibit to the record, this Court can determine that this photograph depicts an African-American male dressed in a black T-shirt, on the front of which is printed in large, block letters, the middle ones of which appear to cast a light blue hue, the word "Hornets." Thus, Reynolds's mug shot substantiates his appellate counsel's assertion that this photograph would verify that Reynolds was not wearing a "blue" T-shirt when he was arrested.

¶36. Nonetheless, record is opaque about when Reynolds's mug shot became available to Reynolds's trial counsel. Reynolds's trial counsel was the second lawyer to represent Reynolds by order of the trial court. Reynolds's trial counsel advised the trial judge that he had "picked up" the State's discovery file from Reynolds's first counsel. The record of the trial is utterly devoid of when Reynolds's mug shot "surfaced." There is no evidence that Reynolds told his trial counsel about the mug shot, and Reynolds's appellate counsel offers nothing in the record to establish that the mug shot was available to Reynolds's trial counsel when he represented Reynolds during this second trial.

¶37. In the absence of evidence in the record that Reynolds's trial counsel knew of the existence of his client's mug shot or had been advised of the potential evidentiary significance of the mug shot, this Court declines to agree with Reynolds's contention that his trial counsel's performance was deficient simply because he did not introduce his mug shot into evidence. Again, the presumption that trial counsel was competent must prevail in view of the state of the record, and, again, this Court resolves the third facet of Reynolds's only issue against him.

### 4. Failure to object to the State's cross-examination of Sergeant Pitts

¶38. We have quoted in full the portion of the assistant district attorney's cross-examination of Sergeant Pitts which Reynolds asserts was the result of his trial counsel's deficient performance because his trial counsel failed to object to any of it. This Court does not doubt that this portion of the State's cross-examination of Sergeant Pitts weakened Reynolds's defense that Agent Hooker collared the wrong man for having sold him the one rock of crack cocaine for twenty dollars. This portion of the cross-examination of Sergeant Pitts created the possibility that Reynolds completed the undated and unsigned personal property form which was introduced into evidence on October 23, 1996, when he returned from the work farm to the detention center. Moreover, this cross-examination established the possibility that Reynolds placed the black T-shirt in the bag found in the detention center on that date rather than the date he was arrested.

¶39. Although Reynolds argues that his trial counsel "should have strenuously objected to the records officer's [Sergeant Pitts] speculative testimony concerning procedures at an entirely different facility [the work farm], without any foundation being laid that the said officer had any direct knowledge of such procedures," he cites no case nor other authority to support his argument. Indeed, neither does the State cite any authority specifically relevant to this fourth facet of Reynolds's only issue. Rule 611(b) of the Mississippi Rules of Evidence provides: "Cross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." M.R.E. 611(b).

¶40. The assistant district attorney's cross-examination elicited information to demonstrate the possibilities that the personal property form on which Reynolds relied to impeach Agent Hooker's description of the clothing of the suspect whom he arrested was completed on an entirely different date. The cross-examination also established the possibility that Reynolds maintained control of his personal items of clothing while he worked at the Harrison County work farm as a trustee. Rule 401 of the Mississippi Rules of evidence defines "relevant evidence" as:

> [E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

M.R.E. 401. Rule 402 simply provides that "[a]ll relevant evidence is admissible." M.R.E. 402. From the State's perspective, its cross-examination of Sergeant Pitts, about which Reynolds complains, was relevant to determine when the personal property form was completed and, hence, tended to make the existence of whether Agent Hooker had mis-identified Reynolds as the man who sold him the rock of crack cocaine based upon Agent Hooker's erroneous description of the seller's clothing "less probable than it would be without the evidence." Reynolds's trial counsel's failure to object to the State's cross-examination of Sergeant Pitts cannot be deemed deficient. Hence, this Court holds that Reynolds has failed to satisfy the first prong of the *Strickland* test to determine whether Reynolds's representation was deficient, and it resolves adversely to Reynolds his fourth and final aspect of his only issue. *See Irving v. State*, 441 So. 2d 846, 856 (Miss. 1983) (opining that "[a]s to the leading questions, the same testimony could have been elicited by simple rephrasing of the questions" and "[t]herefore it cannot be said that [the defendant] suffered any actual or substantial disadvantage because of the failure to object").

## D. Summary of the issue

¶41. "[T]here is 'no single, particular way to defend a client or to provide effective assistance.'" *Handley,* 574 So. 2d at 684 (quoting *Cabello*, 524 So. 2d at 317). Defense counsel is presumed competent. *Johnson v. State*, 476 So. 2d 1195, 1204 (Miss. 1985). "There is no constitutional right then to errorless counsel . . . ." *See Handley*, 574 So. 2d at 683 (quoting *Cabello*, 524 So. 2d at 315). In the first, third, and fourth facet of Reynolds's issue, Reynolds fails to persuade this Court that the performance of his trial counsel was deficient -- the first prong of *Strickland*. While his trial counsel's failure to move to introduce into evidence the bag, pants, T-shirt, and cap which had been marked for identification was arguably deficient, the remaining evidence concerning the discrepancy in Agent Hooker's description of the seller's clothing and the clothing which Reynolds was wearing combined with Agent Hooker's identifying Reynolds by his face, and not his clothing, fails "to undermine [our] confidence in the outcome" of Reynolds's conviction of the sale of cocaine, a Schedule II controlled substance, as charged in the indictment on which Reynolds was tried. Therefore, the final judgment of conviction and the sentencing order of the Circuit Court of the First Judicial District of Harrison County are affirmed.

¶42. **THE FINAL JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HARRISON COUNTY OF THE APPELLANT'S CONVICTION OF THE TRANSFER OF COCAINE, A SCHEDULE II CONTROLLED SUBSTANCE AND ITS SENTENCE OF THE APPELLANT TO SERVE TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO SERVE DAY FOR DAY WITHOUT HOPE OF PAROLE OR PROBATION AS A HABITUAL OFFENDER PURSUANT TO SECTION 99-19-81 OF THE MISSISSIPPI CODE ARE AFFIRMED. ALL COSTS OF THIS**

**APPEAL ARE ASSESSED TO HARRISON COUNTY.**

**McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.**

1. There is but one purpose in our use of the adjective "African-American" to describe Mr. Reynolds and the composition of the persons gathered in front of Cohea's lounge, and that purpose is to acknowledge the gravity of Reynolds's one issue, a significant aspect of which is whether MBN Agent Robert Hooker correctly identified Reynolds as the man who sold him the crack cocaine.

2. The personal property form consisted of two parts. The top part was the receipt for the arrestee's personal property. The bottom part was a receipt for the linens and other personal items of hygiene which the sheriff's department issued each arrestee. Reynolds's signature appeared beneath the bottom part only. Neither part was dated.