# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00103-COA

**PETER J. HENDERSON A/K/A PETER JULIUS HENDERSON**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                 **APPELLEE**

DATE OF JUDGMENT:            12/12/2017
TRIAL JUDGE:                 HON. CHRISTOPHER LOUIS SCHMIDT
COURT FROM WHICH APPEALED:   HARRISON COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: MOLLIE MARIE MCMILLIN
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: SCOTT STUART
DISTRICT ATTORNEY:           JOEL SMITH
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 05/21/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### TINDELL, J., FOR THE COURT:

¶1. A Harrison County jury convicted Peter Henderson of the first-degree (deliberate-design) murder of Chandler Pugh. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). The Harrison County Circuit Court, First Judicial District, sentenced Henderson to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Henderson argues that his trial attorneys rendered ineffective assistance and that the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm

Henderson's conviction and sentence.

**FACTS**

¶2.     At the time of Pugh's death, Henderson was dating Pugh's ex-girlfriend, Charlotte Guillotte. Henderson lived in Mobile, Alabama, and Guillotte lived in Gulfport, Mississippi. Guillotte testified that on the afternoon of August 10, 2016, Pugh forced his way into her apartment and assaulted and threatened her in front of the couple's youngest son.[1] Guillotte reported the incident to police. She also called Henderson and told him about the altercation. Henderson arrived in Gulfport that evening and met Guillotte at her apartment. He then accompanied Guillotte to the police station to pick up paperwork for a protective order against Pugh. Guillotte stated that she observed Henderson with his gun when they left her home. Both Guillotte and Henderson testified that Henderson always carried his gun because he worked as a security guard for several night clubs.

¶3.     Guillotte texted Pugh and told him she planned to get the protective order against him. Pugh repeatedly tried to call Guillotte, but she refused to answer her phone. Pugh then tried to text Guillotte. By way of his text messages, Pugh apologized to Guillotte for his behavior earlier that day and told Guillotte that he would not come around again. Based on these statements, Guillotte felt that Pugh had dropped the matter.

¶4.     After leaving the police station, Guillotte and Henderson stopped at a gas station so Guillotte could buy cigarettes. As Guillotte returned to her car and began to open her driver's side door, Pugh unexpectedly pulled up beside her. Although Pugh's sudden arrival

---

[1] Guillotte and Pugh had two children together during their dating relationship.

startled her, Guillotte stated that she was not scared of Pugh due to his earlier apology. Guillotte testified, however, that she was startled enough that she jumped and ran around her car. Pugh exited his car and followed Guillotte until she stopped in front of her car. Guillotte testified that Pugh repeatedly asked her to drop Henderson off so that she and Pugh could talk privately. Guillotte replied that she did not want to talk to Pugh, and she asked him to leave.

¶5.     Guillotte stated that she never saw a weapon in Pugh's hands while they were at the gas station. She also testified that, although Pugh spoke in a loud voice, that was just the way he acted, and she stated that he never verbally or physically threatened her during the conversation. While Guillotte and Pugh were talking in front of Guillotte's car, Henderson exited the passenger side of the car and approached them. Guillotte testified that Henderson told Pugh to leave Guillotte alone. Pugh responded that Henderson needed to "just step back" because his discussion with Guillotte did not involve Henderson. Guillotte further stated:

> [A]t one point in time, I was going to try to get in my car, and I didn't see [Henderson] showing [Pugh] his gun, but I heard [Pugh] say, ["O]h, I see your gun, that's nice.["] And he [(Pugh)] told me, . . . ["B]ut Charlotte, you know I'm crazy. You know I'm not scared of no gun.["] I told [Pugh], ["]I don't want you to be scared, but can you just please go[?"]

Guillotte testified that Pugh refused to leave, and he again urged her to drop off Henderson so she and Pugh could speak privately. During the confrontation, Guillotte never saw Pugh lunge at or strike Henderson.

¶6.     Guillotte stated that she eventually got back into her car. Pugh continued to speak to

3

her through the open driver's side window, and Guillotte eventually agreed to his request that she drop off Henderson and speak privately with Pugh. Guillotte testified that Pugh then leaned inside her car. Although she could not remember for sure, Guillotte stated that she thought Pugh buckled her seatbelt for her. During this interaction, Henderson stood by the driver's side fender of Guillotte's car with his gun in his hand. After Pugh straightened up, Guillotte heard gunshots. She then realized that Henderson had shot Pugh. As she heard the gunshots, Guillotte looked at Pugh. She saw Pugh lean down, stand back up, and then fall to the ground. Guillotte reiterated that, while at the gas station, she never saw Pugh with a weapon, and she never heard him threaten Henderson or attempt to strike or lunge at Henderson.

¶7. Henderson called 911 and reported the shooting. When officers arrived at the scene, he told them he had shot Pugh. The forensic pathologist who examined Pugh's body testified that Pugh died from multiple gunshot wounds. The pathologist testified that Pugh sustained three shots to his chest and one to his back. During their investigation, police discovered a deleted text message from Henderson on Guillotte's phone. Henderson sent the message at 11:44 p.m. on August 4, 2016, which was six days before the shooting. Henderson's message to Guillotte stated, "That n---- don't want to see me. I kill that f---- n----. What he mad for[?]" While searching Henderson's phone, the police also discovered that, about an hour after sending the text message to Guillotte, Henderson did an Internet search on Mississippi gun laws. Specifically, he looked at stand-your-ground gun laws. The police also recovered video footage of the shooting, which the State introduced into evidence.

4

¶8.    Henderson testified on his own behalf.  He stated that Guillotte called him the afternoon of August 10, 2016, and told him about the altercation with Pugh.  Henderson stated that Guillotte sounded hysterical and insisted that he drive to Gulfport as quickly as possible.  Based on his conversations with Guillotte throughout the afternoon, Henderson believed that Guillotte was afraid of Pugh and that she was waiting for Henderson to accompany her to the police station to pick up the paperwork for a protective order.  Henderson testified he was aware of the contentious nature of Guillotte's prior dating relationship with Pugh because Guillotte had told him several stories about the relationship.

¶9.    When Henderson arrived at Guillotte's apartment, he stated that Guillotte showed him text messages Pugh had sent her.  According to Henderson, Pugh's text messages stated that Pugh "was going to come back and kill [Guillotte] and going to kill [Henderson]."  Henderson testified that he was well aware of Pugh's attempts throughout that evening to contact Guillotte through text messages and phone calls.  As he and Guillotte waited at the police station, Henderson testified that Pugh continued to repeatedly call Guillotte.  Henderson stated that Pugh then sent Guillotte a text message that indicated Pugh had seen Henderson's car parked at Guillotte's apartment.  Henderson said he was able to see the text message because he was sitting right beside Guillotte when she read the message. Henderson further testified the message scared him because it implied that Pugh had driven by Guillotte's apartment.  Henderson also stated that he told the police officer who spoke to him and Guillotte about Pugh's threatening messages, and he expressed to the officer that he was scared.

¶10.   Henderson confirmed that he and Guillotte stopped at a gas station to buy cigarettes. As Guillotte reached her driver's side door, Henderson saw another car suddenly drive up next to Guillotte. Henderson stated that Guillotte jumped out of the car's way, and when Pugh exited the other vehicle, Guillotte ran behind her car. Realizing that the new arrival must be Pugh, Henderson grabbed his gun and exited Guillotte's car. Henderson testified that Guillotte and Pugh were screaming at each other and that Guillotte kept asking Pugh to leave her alone. Henderson further testified that Pugh's hands were balled into fists, and Pugh was "all in [Guillotte's] face . . . ."

¶11.   Henderson stated that he asked Pugh to calm down and to leave Guillotte alone. According to Henderson, Pugh put his hand in Henderson's face. Henderson stated that Guillotte tried to get back into her car, and Pugh followed her. Then, Pugh looked at the gun in Henderson's hand and said, "[T]hat's a nice gun." After Pugh's comment, Henderson testified that he felt like Pugh was "kind of off or something[,]" and he stated that he was unsure whether Pugh also had a weapon on him.

¶12.   Henderson testified that Guillotte got back into her car, and Pugh ran to his own car and opened the door. At the time, Henderson was standing by the driver's side fender of Guillotte's car with his gun still in his hand. Henderson testified that Pugh then returned to Guillotte's car, opened the driver's side door, and jumped on top of Guillotte. Henderson stated that he thought Pugh was killing Guillotte. When Pugh exited the car, Henderson testified that he did not see Guillotte moving in the driver's seat, and he thought Pugh had killed Guillotte. Henderson stated that Pugh then came toward him, and he fired several

6

shots at Pugh. According to Henderson, he was afraid for his own life and for Guillotte's life when he shot Pugh. He further testified that he only shot Pugh in the chest and that the pathologist must have mistaken the exit wound in Pugh's back as an entrance wound.

¶13. After considering all the testimony and evidence, including the video footage of the shooting, the jury convicted Henderson of first-degree murder. The circuit court sentenced Henderson to life imprisonment in MDOC's custody. Henderson filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved, he appeals his conviction and sentence.

## DISCUSSION

### I. Ineffective Assistance

¶14. Henderson argues his trial attorneys provided ineffective assistance because they failed to request jury instructions on all of his theories of defense. Although the jury received a self-defense instruction, Henderson assigns error to his trial attorneys' failure to also request a castle-doctrine instruction, a stand-your-ground instruction, and a defense-of-others instruction. Henderson claims that the evidence supported these additional instructions. He further asserts that such "instructions would have given the jury a more complete picture of the law regarding self-defense." Henderson therefore asks this Court to reverse his conviction and sentence and to remand this case for a new trial.

¶15. "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during [postconviction] proceedings." *Jones v. State*, 252 So. 3d 574, 589 (¶60) (Miss. 2018). We may, however, address an ineffective-assistance claim on direct appeal when the

7

issue presented is "based on facts fully apparent from the record" and a different attorney represents the defendant on appeal. *Archer v. State*, 986 So. 2d 951, 955 (¶16) (Miss. 2008). Finding that to be the case here, we address the merits of Henderson's ineffective-assistance claim.

¶16. To succeed on his ineffective-assistance claim, Henderson must prove (1) his trial attorneys' performance was deficient, and (2) their deficient performance deprived him of a fair trial. *Dartez v. State*, 177 So. 3d 420, 423 (¶19) (Miss. 2015). As the Mississippi Supreme Court explained in *Dartez*:

> [The appellate court] look[s] at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial. There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that, but for the attorney's errors, the outcome would have been different, will we find that counsel's performance was deficient.

*Id.* (citations omitted).

¶17. During closing arguments, Henderson's defense counsel did not even reference the castle doctrine or stand-your-ground gun laws. And while defense counsel mentioned that Henderson's actions also served to protect Guillotte, the main argument espoused was that Henderson shot Pugh in self-defense. As reflected in the trial transcript, Henderson's trial attorneys argued as follows during closing argument:

> [Y]ou can see that on the video, [Mr. Pugh] is in [Ms. Guillotte's] window, he steps back, he walks this way, toward Mr. Henderson, admittedly he [(Mr. Henderson)] was standing there. Now, [Mr. Pugh's] car was there, too. We don't know what's in Mr. Pugh's mind. We know he's mad. We know he doesn't want Mr. Henderson there. He doesn't want Mr. Henderson anywhere around the mother of his children, and I can bet you he doesn't want him around his kids, either. So Mr. Henderson, not knowing what's in Mr. Pugh's

8

mind, freaks out and shoots.

. . . .

They were in close proximity to each other. When he turned and was coming toward Mr. Henderson, Mr. Henderson did not know what was in Mr. Pugh's mind. Did not know what was in his hands. . . . So I submit to you that Mr. Henderson[,] . . . in his mind[,] believed that the danger was real and imminent and that his life was in danger, and that he had to do something to protect himself, let alone Ms. Guillotte.

. . . .

[A]nd I think you will see that Mr. Henderson was purely acting in self-defense. He told you on the stand he didn't come here with those intentions to shoot or even kill Mr. Pugh, or even get in a fight with him.

. . . .

And in order for you to consider that [Mr. Henderson] was acting in self-defense, you have to consider what was in his mind. What would a reasonable person do in that circumstance . . . [where] somebody who has been choking and fighting somebody all day starts walking toward you[?] And you don't know what's in his hand or what's going on with him. And as close as they were, he didn't need a gun to hurt Mr. Henderson, he didn't have to have a gun. The State of Mississippi lists several different weapons as deadly weapons, not just the firearm, ladies and gentlemen.

¶18. "Defense counsel is presumed competent[,]" and "no constitutional right . . . to errorless counsel" exists. *Reynolds v. State*, 736 So. 2d 500, 511 (¶41) (Miss. Ct. App. 1999). Further, no single correct way exists for defending a client or providing effective assistance. *Id.* "Whether to request a certain instruction generally is a matter of trial strategy." *McCoy v. State*, 147 So. 3d 333, 347 (¶36) (Miss. 2014). And "[d]ecisions that fall within the realm of trial strategy do not amount to ineffective assistance of counsel." *Ford v. State*, 230 So. 3d 316, 320 (¶9) (Miss. Ct. App. 2017).

9

¶19. Here, Henderson fails to overcome the strong presumption that his trial attorneys' failure to offer instructions on the castle doctrine, standing your ground, and defense of others was not part of their trial strategy. In addition to not showing deficient performance, Henderson fails to demonstrate there was a reasonable probability that such instructions would have changed the result of his trial. Based on the questions asked by Henderson's trial attorneys and the closing argument they made to the jury, the defense's primary theory appeared to be that Henderson shot Pugh purely in self-defense. Offering instructions on the other theories that Henderson now mentions may very well have detracted from this primary theory of self-defense. Thus, from a review of the record, we find Henderson fails to meet his high burden for establishing ineffective assistance. We therefore conclude this assignment of error lacks merit.

## II. Weight of the Evidence

¶20. Henderson next argues the jury's verdict was against the overwhelming weight of the evidence, which he asserts supports a finding that he killed Pugh in justifiable self-defense. Alternatively, Henderson contends that, at most, he is guilty of manslaughter under a theory of imperfect self-defense. As this Court recently explained:

> When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. The evidence should be viewed in the light most favorable to the verdict, and we will affirm unless the trial court abused its discretion in denying a new trial.

*Shaheed v. State*, 205 So. 3d 1105, 1109 (¶12) (Miss. Ct. App. 2016) (citation and internal quotation marks omitted).

10

¶21. Despite Henderson's assertions to the contrary, the State presented evidence from which a jury could conclude that Henderson shot Pugh with deliberate design to effect Pugh's death and not in self-defense. *See* Miss. Code Ann. § 97-3-19(1)(a) ("The killing of a human being without the authority of law by any means or in any manner . . . [, w]hen done with deliberate design to effect the death of the person killed, . . . shall be first-degree murder . . . ."). Guillotte testified that, although Pugh's arrival at the gas station startled her, she was not afraid of him because he had apologized for his earlier actions. In addition, even though Pugh was "talking very loudly" to her at the gas station, Guillotte explained that was just his manner and that he never threatened her. Guillotte further testified that she never saw a weapon in Pugh's possession and that he never physically or verbally threatened her or Henderson.

¶22. As Guillotte got back into her car, Pugh continued to speak with her. At the end of their conversation, Pugh leaned into Guillotte's car through the open driver's side window. Although she could not remember for sure, Guillotte testified that she thought Pugh buckled her seatbelt for her. He then straightened up and leaned back out of her car. The video footage of the shooting shows that, during this exchange, Henderson stood by the driver's side fender of Guillotte's car. As the trial transcript reflects, Henderson held his gun in his hand. As Pugh stood up and turned away from Guillotte's car, Henderson shot Pugh multiple times. The video never showed a weapon in Pugh's hands, and the police found no weapon on his body.

¶23. At trial, the pathologist who performed the autopsy on Pugh's body testified that Pugh

had been shot four times—one time in the back and three times in the chest. The State entered into evidence a text message Henderson sent Guillotte six days before the shooting in which Henderson stated that he would kill Pugh. The State also offered evidence showing that, just an hour after sending the text message, Henderson conducted an Internet search on Mississippi's stand-your-ground gun laws.

¶24. As demonstrated by its verdict of first-degree murder, the jury clearly accepted the State's evidence and the version of events presented by the State. "Whether we would have returned the same verdict on the evidence presented is not the relevant question at this stage . . . ." *Shaheed*, 205 So. 3d at 1111 (¶18). Instead, "viewing the evidence in the light most favorable to the verdict, the only issues are whether there was sufficient evidence for a rational trier of fact to have returned the verdict and whether the trial [court] . . . abused … [its] discretion by ruling that the verdict was not contrary to the overwhelming weight of the evidence." *Id.* Applying this standard of review, we cannot say that upholding Henderson's conviction sanctions an unconscionable injustice or that the circuit court abused its discretion by denying Henderson's new-trial motion. *See id.* at 1109 (¶12). We therefore find this assignment of error lacks merit.

## CONCLUSION

¶25. Because we find no merit to Henderson's assignments of error on appeal, we affirm his conviction and sentence.

¶26. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. BARNES, C.J.,**

12

**CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**